UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 16-CIV-61042-GAYLES
MAGISTRATE JUDGE P.A. WHITE

MARK ONDICH,                    :

     Petitioner,              :

v.                              :        <u>REPORT OF</u>
                                         <u>MAGISTRATE JUDGE</u>
JULIE JONES,                    :

     Respondent.              :
_____

## <u>Introduction</u>

Mark Ondich, who is presently confined at the Central Florida Reception Center in Orlando, Florida, has filed a pro se petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254, attacking his conviction and sentence in case number 08-13785 CF 10A, entered in the Seventeenth Judicial Circuit Court of Broward County.

This cause has been referred to the undersigned for consideration and report pursuant to 28 U.S.C. § 636(b)(1)(B) and Rules 8 and 10 of the Rules Governing Section 2254 Cases in the United States District Courts.

The court has before it the petition for writ of habeas corpus (DE#1), Petitioner's memorandum of law in support thereof (DE#4), Petitioner's verification of his petition (DE#12), Respondent's response to an order to show cause and appendix of exhibits (DE#16), Petitioner's reply (DE#17), Petitioner's Notice of Typographical Error (DE#18), and the documents appended to Petitioner's Motion to Take Judicial Notice (DE#27).

## <u>Claim</u>

Petitioner's sole claim in this proceeding is ineffective assistance resulting in an unknowing and involuntary guilty plea.

<u>Procedural History</u>

Petitioner was charged by the State of Florida with three counts of sexual battery using great force, one count of kidnapping, and one count of domestic battery by strangulation, all perpetrated on the same victim on July 19, 2008. (DE#16, Exhibit 2).

At a pretrial hearing on September 10, 2009, at 12:15 p.m., the prosecutor told the judge that Petitioner was facing four life felonies and that the State had offered Petitioner a below guidelines plea offer of seventeen years, followed by thirty years of probation. (<u>See</u> <u>Id.</u> at Exhibit 3.5). Defense counsel noted at this pretrial hearing that he had never anticipated that the State would be making such a (favorable) offer and that there was a 911 call that captured the entire sexual battery, but he was ready to go to trial if Petitioner did not take the plea offer. (<u>Id.</u>). Defense counsel noted Petitioner had to decide whether or not to accept the offer. (<u>Id.</u>). The judge added that there were some phone calls that Petitioner made from the jail that allegedly incriminated Petitioner. (<u>Id.</u>). The judge stated that if Petitioner was convicted of even one count of sexual battery, he would get life in prison and never get out. (<u>Id.</u>). The judge asked Petitioner if he was interested in that offer at all, and Petitioner responded that he wanted to go to trial. (<u>Id.</u>). The parties then discussed trial preparations. (<u>Id.</u>)

After Petitioner rejected the plea offer, Petitioner stated that he wanted to listen to a 911 tape that had been recorded. (<u>Id.</u> at Exhibit 22, p.10). The entire 911 tape was played for Petitioner in the courtroom at 2:30 that same afternoon, September 10, 2009. (<u>Id.</u> at 10). A tape of a jailhouse call between Petitioner and his uncle was also played for Petitioner in the courtroom that afternoon. (<u>Id.</u> at 11).

Following the playing of the tapes, Petitioner accepted the plea offer and entered a plea the next day (DE#16, Exhibit 22, p.11; Exhibit 4, p.13). At the change of plea hearing on September 11, 2009, counsel explained that Petitioner, after reviewing the State's evidence, had decided to enter a plea to the instant charges. (Id. at Exhibit 4, p.14). The judge reminded Petitioner that he was charged with three counts of sexual battery with great force, a first degree felony punishable by life in prison. (Id. at 16). The prosecutor added that these were mandatory life sentences; the judge accepted that. (Id.). The judge reminded Petitioner that he was charged with a fourth count, kidnapping, which was a felony punishable by life, and a fifth count, felony battery, which was a third degree felony punishable by up to five years in prison. (Id.).

The judge found a factual basis for the plea based on the probable cause affidavit and stipulation of the parties. (Id. at 19-20). After the plea colloquy with Petitioner, the judge accepted the plea. (Id at 16-22). At the end of the plea hearing, Petitioner stated that he had wanted the opportunity to listen to the tapes, which he had not prior to his initial rejection of the plea offer, and that he "made his decision based on that." (Id. at 23).

Petitioner's change-of-plea form showed that Petitioner was facing the possibility of four consecutive life sentences on counts one through four, plus a five-year sentence on count five. (DE#16, Exhibit 3). Petitioner's scoresheet showed that Petitioner scored a lowest permissible prison sentence of 351.825 months (or 29.32 years) in prison. (Id. at Exhibit 7). However, Petitioner entered a negotiated plea of no contest to the charges on September 11, 2009, in exchange for a downward departure sentence of seventeen years in prison. (Id. at Exhibits 3, 4). Accordingly, he was adjudicated guilty and sentenced to a downward departure sentence of seventeen years in prison as a sexual predator, followed by

thirty years of sexual offender probation. (Id. at Exhibit 4, p.8; Exhibit 6).

On October 8, 2009, Petitioner filed a motion to withdraw his guilty plea, asserting that he was unaware of his ability to challenge the admission of his statements to police and the 911 call, and that he was unaware that he could not be convicted of three counts of sexual battery on double jeopardy grounds. (Id. at Exhibit 9). Following a response by the State, the trial court denied the motion to withdraw plea. (Id. at Exhibits 11, 12). Petitioner appealed to the District Court of the State of Florida, Fourth District, in case number 4D09-5355. (Id. at Exhibit 13). Petitioner asserted on appeal that the trial court erred in not conducting an evidentiary hearing as to the merits of the motion to withdraw plea, or alternatively, by not accepting as true the allegations in the motion which were not conclusively repudiated by the record. (Id. at Exhibit 14). On December 21, 2011, the Fourth District per curiam affirmed the summary denial of Petitioner's motion to withdraw plea without comment. Ondich v. State, 76 So. 3d 311 (Fla. 4th DCA 2011).

On February 5, 2013, Petitioner filed a motion for state post-conviction relief pursuant to Fla.R.Crim.P. 3.850, through counsel. (DE#16, p.4).[1]  The motion had the incorrect case number on the caption, but referenced the correct case number on the second page in the statement of facts. (DE#17, Exhibit A).  The basis of that motion was that Petitioner was misadvised that he faced a mandatory life sentence if he were convicted at trial.  (Id.).

On June 12, 2013, counsel filed a motion to correct scrivener's error or, in the alternative, for leave to amend

---

[1]Because that motion was filed by counsel, Petitioner does not receive the benefit of the prison mailbox rule. See Houston v. Lack, 487 U.S. 266, 108 S.Ct. 2379, 101 L.Ed.2d 245 (1988)(The "prison mailbox rule," provides that a prisoner's documents are deemed filed at the moment the prisoner delivers them to prison authorities for forwarding to a court clerk.).

Petitioner's 3.850 motion. (DE#16, Exhibit 18).  The motion explained that the original 3.850 motion inadvertently listed the case number for the deposition of the victim and that, when the judge issued an order for the State to respond, the State did indeed respond and noted the error in the case number. (Id.).  The motion thus requested that the scrivener's error be corrected and that the State be ordered to respond under the correct case number or, in the alternative, that Movant be granted leave to file an amended motion dated *nunc pro tunc* to the date of the original filing. (Id.).

It is unclear what happened to Petitioner's motion to amend or, in the alternative, to file an amended motion dated *nunc pro tunc* to the date of the original filing.  All that can be gleaned from the online docket and the exhibits that the State has filed is that, on June 12, 2013, the Court received the amended 3.850 motion reflecting the corrected case number raising the same single ground for relief, and that the state court ordered the State to respond on that same date. (DE#16, Exhibit 19, 20).

A hearing was held on Petitioner's 3.850 motion on November 21, 2014. (Id. at Exhibit 22). Among the exhibits submitted at the hearing were the 911 call which contained a graphic audio recording of Petitioner's sexual assault on the victim, and Petitioner's jail call to his Uncle Frankie in which he admitted raping the victim. (See, generally, Id.).

At the evidentiary hearing on Petitioner's amended Rule 3.850 motion, Petitioner claimed that he would not have taken the plea bargain if he had been advised that the sexual battery charges were not mandatory life offenses, and would have proceeded to trial instead. (DE#16, Exhibit 22, p.14). Petitioner asserted the 911 tapes were factored into his decision but it was not the sole basis of his decision. (Id.). Petitioner denied being aware that the seventeen-year sentence was a downward departure from the

sentencing guidelines despite its being mentioned at the September 10, 2009, discussion about the plea offer. (Id. at p.15). He claimed he did not recall if he was ever told that he scored out to twenty-nine years under the sentencing guidelines. (Id.).

On cross-examination, Petitioner admitted that the written change of plea form he signed and initialed said that his maximum sentence was "life times four plus five years Florida State prison." (Id. at p.18). He further admitted that the plea form did not say anything about the sentences being mandatory. (Id.). Petitioner claimed that, although it was his initials and signature on the plea form, "[t]hat could have been written in afterwards. I don't remember seeing that." (Id.). Petitioner did admit that he initialed the part of the form stating that he had read the form and he understood it, and he signed the form. (Id. at p.19). He admitted that he had stated during the plea colloquy on September 11, 2009, that he had reviewed the form with his attorney and initialed and signed it. (Id. at p.20).

Petitioner admitted that he rejected the plea offer on September 10, 2009, even though he was told at that time he was facing a mandatory life sentence, and there was a plea offer of seventeen years prison plus thirty years probation. (Id. at pp.20-21). Petitioner also admitted that his scoresheet showed the lowest permissible prison sentence to be approximately twenty-nine years. (Id. at pp.24-25). Petitioner stated he did not recall if he discussed that with his attorney. (Id. at p.25). Petitioner admitted that this lowest permissible sentence was listed on his plea form as well, the one that he signed, although he claimed "that could have been written in there afterwards." (Id. at 26).

Petitioner further admitted that he was forty-nine years old at the time that he entered the plea. (Id. at pp.16, 25). Therefore, he would be in the range of about seventy-five or seventy-six years old by the time he got out. (Id. at p.25).

Petitioner's former counsel, A.J. Amoroso, testified he had handled thousands of pleas in criminal court. (Id. at p.37). With respect to the evidence against Petitioner, he explained that, during the sexual battery, the victim dialed 911 and then dropped the phone on the floor, with the result being that everything that transpired between dispatch picking up the line to law enforcement arriving captured on tape. (Id. at pp.39-40).

Counsel also testified that he deposed the victim. (Id. at p.39). He further testified that there was also at least one jail phone call recorded. (Id. at 40). Counsel recalled one in particular between Petitioner and his Uncle Frankie wherein Petitioner admitted something of a sexual nature took place and it was done by force. (Id. at pp.40-41).

Counsel Amoroso stated that the status conference on September 10, 2009 was the last one before they would be going to trial the following week. (Id. at pp.42-43). Amoroso testified that he was ready for trial. (Id. at p.44).  He also testified that he and Petitioner discussed the minimum sentence, and that Petitioner wanted to go to trial. (Id. at p.44).  Amoroso testified that there wasn't much of an alternative because the bottom of the guidelines was approximately twenty-nine years. (Id. at p.44). Amoroso was pretty sure that Petitioner recognized that, being fifty years old, even a bottom of the guidelines sentence was a life sentence in and of itself. (Id. at pp.44-45).

Amoroso testified that, between the 3rd and the 10th of September, he discussed with the prosecutor whether the State would make a plea offer. (Id. at pp.45-46). Petitioner had never expected the State to offer anything less than the bottom of the guidelines, which was about twenty-nine years. (Id. at p.46). The offer was substantially less than that which Petitioner would have been facing had he gone to trial. (Id. at p.47). Amoroso testified that he discussed that plea offer with Petitioner. (Id. at p.47). He

further testified that he would have told Petitioner what the bottom of the guidelines was, what Petitioner scored, and what the State was offering. (Id. at p.47). Amoroso explained that he would have told Petitioner that he, Amoroso, had prepped the case, it was ready for trial, and that he would do whatever Petitioner wanted to do, and that Petitioner could make the call. (Id. at p.47).

The September 10, 2009 status conference was also the topic of testimony at the hearing. (Id. at p.47). The testimony established that the judge told Petitioner he was looking at life and the offer was seventeen years but Petitioner rejected the offer. (Id. at pp.47-48). At some point afterwards, during discussion of the evidence in court, Petitioner stated that he had never heard the 911 tape himself. (Id. at p.49). The prosecutor played the tape in the courtroom that afternoon. (Id. at pp.50-51). Amoroso testified that he was sitting next to Petitioner as he listened to the 911 tape, as well as the phone call to Uncle Frankie. (Id. at pp.51-53).

The State then played the tapes again for the judge at the Rule 3.850 evidentiary hearing. (Id. at p.59). The 911 tape graphically records the assault as it was occurring, the details of which need not be reproduced here for the sake of the reader. (Id. at pp.59-67). The tape of the jail phone call talking to his uncle was also played, wherein Petitioner admitted that he did not know, until his lawyer told him, that the victim had called 911 and that the entire assault was recorded. (Id. at pp.68-77). On the tape, Petitioner also admitted to his uncle that he had forced himself on the victim, that he took the victim behind a warehouse, that his life was over and that he wanted money for a better attorney, and that he kept getting himself into the same situation. (Id.).

Amoroso stated at the Rule 3.850 evidentiary hearing that he sat with Petitioner as Petitioner listened to these tapes. (Id. at

p.77). When asked about Petitioner's reaction when he heard the tapes, Amoroso said:

> It was a lot of head shaking. The 911 call was played first. There was a lot of head shaking. And just looking at his physical appearance he slowly started to kind of-became a little more sullen.
>
> And during the Uncle Frankie phone call, he put his head down, sulked. And when the call was over he looked at me and told me he was taking the plea.

(Id. at p.77). Amoroso testified that he so advised the prosecutor, and that they returned the next day to do the plea. (Id. at p.78).

Amoroso testified that he gave Petitioner his plea sheet and rights waiver form. (Id. at p.78). Amoroso testified that he wrote on the form, on September 11, 2009, that the maximum penalty was life times four for the first four counts plus five years in prison for the felony battery, and that the minimum was approximately 29 years (351.852 months). (Id. at p.79). Amaroso further testified that, after he wrote everything up on the form, he went over it with Petitioner, Petitioner reviewed it, and Petitioner placed his initials on every line, signed it, and put his date of birth. (Id. at p.80). Amoroso then signed the form as well. (Id. at p.80). There was no discussion regarding the maximum sentence other than what Amoroso put on the form. (Id. at p.80). The only thing that changed between Petitioner's rejection of the plea offer and Petitioner's acceptance was that Petitioner heard, for the first time, the 911 call and the phone call to his Uncle Frankie. (Id. at 81).

Amoroso stated that, to the best of his recollection, he never used the word mandatory with Petitioner. (Id. at p.82). Amoroso explained that a mandatory life sentence, meaning that Petitioner went to prison for the rest of his life, was Petitioner's potential exposure at the top and at the bottom was the guidelines minimum sentence. (Id. at p.83). His recollection was that he told

Petitioner here is the bottom of the guidelines and here is your maximum exposure, that being life. (<u>Id.</u> at p.94). He testified that he told Petitioner to anticipate that if he was convicted as charged he would get somewhere between the bottom of the guidelines and life in prison, and it was likely to be closer to life in prison. (<u>Id.</u> at p.94). In Amoroso's opinion, knowing the limited circumstances for a downward departure, there were no grounds for the judge to grant a downward departure. (<u>Id.</u> at p.95).

The judge found that it was clear Petitioner was misinformed by the State and the court about the minimum penalty being a mandatory life sentence. (<u>Id.</u> at p.111). However, the judge noted that Petitioner was looking at a significant sentence regardless, a minimum sentence of twenty-nine years which would, as a practical matter, have been a life sentence, or close to a life sentence, for a man of Petitioner's age. (<u>Id.</u> at pp.111-112). Moreover, there was a real possibility that, had Petitioner lost at trial, the judge would have given him a life sentence. (<u>Id.</u> at p.112). The judge further noted that, even after Petitioner was misinformed by the court as to the existence of a mandatory minimum life sentence, Petitioner was still firm in his desire to go to trial; the misinformation did not alter his view of the case. (<u>Id.</u> at p. 112). Rather, the judge found that it was the playing of the tapes that changed Petitioner's mind and induced him to enter the plea. The judge noted that it is one thing for someone to tell you what's on a tape and it sounds bad, but it is another thing for you to hear it with your own ears. (<u>Id.</u> at pp.112-113). The judge stated that, had the 911 tape been played at trial, it probably would have had a devastating effect on the defense's case:

> You literally got to hear an entire sexual assault on tape. And screaming and pleading from the victim. Orders in a stern voice being given by the defendant. And no doubt the defendant actually hearing with his own ears that tape for the first time, no doubt that had a profound effect on his viewing of the case.

(<u>Id.</u> at p.113).

The judge found that "the change of heart by the defendant as to whether or not to go to trial was primarily, if not entirely, influenced by his sudden reevaluation" of the strength of the State's case against him. (<u>Id.</u> at p.114). Specifically, the judge found that Petitioner had a change of heart after hearing the 911 tape, combined with the recording of his conversation with the uncle. (<u>Id.</u> at p.114). The judge further found that Petitioner's decision to accept the State's plea offer and enter a change of plea immediately after hearing the tapes was not merely coincidental; it was the primary reason, if not the only reason, why he decided to accept the plea offer. (<u>Id.</u> at pp.114-15). Although there were misrepresentations made to Petitioner about the mandatory minimums which his attorney did not correct, the judge found that they were not what caused Petitioner's change of heart. (<u>Id.</u> at p.115). The judge therefore found the misrepresentations were not prejudicial to Petitioner in his decision to accept a plea offer that was below the guidelines. (<u>Id.</u>). Since Petitioner failed to establish actual prejudice, the trial court denied Petitioner's Rule 3.850 motion. (<u>Id.</u> at 115; Exhibit 23).

Petitioner appealed the denial of his Rule 3.850 motion to the Fourth District in case number 4D14-4896. (DE#16, Exhibit 25). Following briefing by the parties, the Fourth District affirmed the denial of Petitioner's motion for post-conviction relief in a *per curiam* decision without comment on May 5, 2015. <u>Ondich v. State</u>, 4D14-4896, 2016 WL 2586414 (Fla. 4th DCA May 5, 2016). The mandate issued on June 3, 2016. (DE#16, Exhibits 30, 31).

Thereafter, on May 11, 2016, Petitioner filed the instant petition for writ of habeas corpus, pursuant to the "prison mailbox rule."

<u>Threshold Issue - Statute of Limitation</u>

Because petitioner filed his federal habeas petition after April 24, 1996, the Antiterrorism and Effective Death Penalty Act ("AEDPA") governs this proceeding. <u>See</u> <u>Wilcox v. Fla.Dep't of Corr.</u>, 158 F.3d 1209, 1210 (11th Cir. 1998)(per curiam).  The AEDPA imposed for the first time a one-year statute of limitations on petitions for writ of habeas corpus filed by state prisoners.[2] <u>See</u>, 28 U.S.C. §2244(d)(1)("A 1-year period of limitation shall apply to an application for a writ of habeas corpus ....").  Once the limitations period is triggered, the AEDPA clock begins to run.

A properly filed application for state post-conviction relief stops the AEDPA clock, and tolls the limitations period.  <u>See</u> 28 U.S.C. §2244(d)(2)(tolling the limitation period for "[t]he time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending").  The AEDPA clock and limitations period then resumes running when the state's highest court issues its mandate

---

[2]The statute provides that the limitations period shall run from the latest of —

> (A)   the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
>
> (B)   the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant is prevented from filing by such State action;
>
> (C)   the date on which the constitutional right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
>
> (D)   the date on which the factual predicate of the claim or claims could have been discovered through the exercise of due diligence.

28 U.S.C. §2244(d)(1).

disposing of the motion for post-conviction relief.[3] <u>Lawrence v. Florida</u>, 549 U.S. 327, 331-32, 127 S.Ct. 1079, 166 L.Ed.2d 924 (2007).  In order to toll the limitations period, however, the state motion for post-conviction relief must be filed before the limitations period expires.  See <u>Tinker v. Moore</u>, 255 F.3d 1331, 1332 (11th Cir. 2001)(holding that a state petition filed after expiration of the federal limitations period cannot toll the period, because there is no period remaining to be tolled); <u>Webster v. Moore</u>, 199 F.3d 1256, 1258-60 (11th Cir. 2000)(holding that even properly filed state court petitions must be pending in order to toll the limitations period), <u>cert. denied</u>, 531 U.S. 991 (2000).

In this case, the limitations period began to run from the date when Petitioner's judgment of conviction became final.  In such cases, the AEDPA "marks finality as of 'the conclusion of direct review of the expiration of the time for seeking such review[.]'" <u>Gonzalez v. Thaler</u>, ___ U.S. _____, 132 S.Ct. 641, 653 (2012); <u>see also</u> 28 U.S.C. §2244(d)(1)(A); <u>Jimenez v. Quarterman</u>, 555 U.S. 113, 118-21, 129 S.Ct. 681, 685-86, 172 L.Ed.2d 475 (2009).  In cases where a criminal defendant pursues direct review to the United States Supreme Court, judgment becomes final when the Supreme Court affirms the conviction on the merits or denies the petition for certiorari.  <u>Gonzalez</u>, 132 S.Ct. at 653.  In all other cases, the judgment becomes final when the time for pursuing direct review in the Supreme Court, or in state court, expires.  <u>Id.</u>

Here, Petitioner's judgment of conviction became final on March 20, 2012, which is which is 90 days after Florida's  District

---

[3]In cases where the defendant does not file a notice of appeal, the AEDPA's limitations period resumes again when the time to seek appellate review of the order denying post-conviction relief expires.  See <u>Cramer v. Sec'y, Dep't of Corr.</u>, 461 F.3d 1380, 1383 (11th Cir. 2006).  In cases where the defendant moves to voluntarily dismiss the application for state post-conviction relief, the limitations period resumes again on the date that the trial court grants the voluntary dismissal.  See <u>Stafford v. Thompson</u>, 328 F.3d 1302, 1303 (11th Cir. 2003).

Court of Appeal issued its decision affirming the state trial
court. See Gonzalez, 132 S.Ct. at 655-56; Chavers v. Sec'y Dep't
of Corr., 468 F.3d 1273 (11th Cir. 2006)(holding that AEDPA's
one-year statute of limitations began to run 90 days after Florida
appellate court affirmed habeas petitioner's conviction, not 90
days after mandate was issued by that court); Pugh, 465 F.3d at
1299-1300 ("In our decisions regarding the timeliness of habeas
petitions filed by Florida prisoners, we have required the
inclusion of the 90-day period for seeking direct review in the
Supreme Court whenever the prisoner sought review in the highest
court of Florida in which direct review could have been had . . .
for example . . . [where] the prisoner could have sought review in
the Supreme Court . . . without first seeking review in the Supreme
Court of Florida"); Clifton v. Sect'y Dep't of Corr., 2012 WL
3670264, *2 n.3 (M.D.Fla., August 27, 2012)(distinguishing Gonzalez
"because in Florida, the Supreme Court of Florida does not have
jurisdiction to review a district court's *per curiam* decision on
direct appeal")(citing Jackson v. State, 926 So.2d 1262, 1265
(Fla.2006)); Gilding v. Sect'y Dep't of Corr., 2012 WL 1883745, *2
n.6 (M.D. Fla., May 22, 2012)(same); see also Sup.Ct.R. 13
(petition for certiorari must be filed within 90 days after entry
of judgment); Sup.Ct.R. 30(1)(the day of the act is not counted and
the last day, if not a weekend or federal holiday, is counted).

Petitioner first filed his state motion for post-conviction
relief pursuant to Fla.R.Crim.P 3.850, the one with the incorrect
case number, February 5, 2013. (DE#16, p.4).[4]  At that point, days

---

[4]Petitioner's motion to withdraw his guilty plea has no bearing on the
limitations analysis in this case.  In Florida, a timely motion to withdraw a
plea after sentencing pursuant to Florida Rule of Criminal Procedure 3.170(l)
tolls the time for rendition of a final order imposing judgment and sentence
until the trial court files a signed, written order disposing of the motion. See
Fla. R. App. P. 9.020; see also Smallwood v. State, 911 So. 2d 849, 850 (Fla. 1st
DCA 2005).  And as set forth above, that is precisely what happened here.
Specifically, it was not until the state trial court denied Petitioner's motion
to withdraw his plea that Petitioner filed his direct appeal, and his direct

of untolled time had expired from **321 days** of untolled time had elapsed since March 20, 2012, the date on which Petitioner's judgment of conviction became final and the AEDPA's one-year limitations period began to run. However, Petitioner's amended 3.850 motion, the one with the correct case number, was not filed until June 12, 2013. At that point, days of untolled time had expired from **448 days** of untolled time had elapsed since March 20, 2012, the date on which the AEDPA's one-year limitations period began to run.

The limitations period then remained tolled until June 3, 2016, the date on which Florida's Fourth District Court of Appeal issued its mandate disposing of Petitioner' appeal from the order denying his 3.850 motion. In the meantime, Petitioner had already filed the instant federal petition for writ of habeas corpus on May 11, 2016, after the Fourth District affirmed the denial of his 3.850 motion, but before the mandate issued. Therefore, no additional time ran on the statute of limitations following disposition of Petitioner's appeal from the denial of his 3.850.

The issue of timeliness in this case thus wholly turns on whether Petitioner's initial, February 5, 2013 initial filing operated to toll the statute of limitations, since his June 12, 2013 was indisputably filed after the AEDPA's one-year limitations period expired. Respondent contends that it does not, because it bore the wrong case number, and was therefore allegedly not "properly filed."

The Supreme Court has explained that a "properly-filed" application for state post-conviction relief is one whose "delivery and acceptance are in compliance with the applicable laws and rules

---

appeal was of course decided subsequent in time. Stated another way, Petitioner's motion to withdraw his guilty plea has no bearing on the limitations analysis because it was filed and resolved by the state appellate court before his judgment of conviction became final for purposes of the start of the AEDPA's limitations period.

governing filings," which generally govern such matters as "the form of the document, the time limits upon its delivery, the court and office in which it must be lodged, and the requisite filing fee." Artuz v. Bennett, 531 U.S. 4 (2000)(overruling Weekley v. Moore, 204 F.3d 1083 (11th Cir. 2000)).

Respondent fails to cite a single case for the proposition that a simple scrivener's error in the case caption renders an application that is otherwise in compliance with the applicable laws and rules governing filings renders it "improperly filed," and the Court's own research has uncovered none.   And this seems logical, since the AEDPA "properly-filed" requirement is concerned not with typos, but rather with "the  form of the document, the time limits upon its delivery, the court and office in which it must be lodged, and the requisite filing fee." Artuz, 531 U.S. at 8.  Indeed, here, Respondent admits that the February motion with the incorrect case number was in fact filed in the proper court, and does not dispute that it was the one that pointed out in its response to that motion that the caption contained a scrivener's error.   And while there is relatively little case law or legislative history to help district courts determine what constitutes "a properly filed application" as used in the AEDPA, at least one district court has construed "properly filed" to mean that "[i]n order to trigger the tolling mechanism, a petitioner's collateral review application must be submitted in accordance with any applicable procedural requirement, *such as notice to the respondent*, correct place of filing, and timeliness of the motion." Hughes v. Irvin, 967 F.Supp. 775, 778 (E.D.N.Y.1997).  Moreover, Respondent wholly fails to address what ever came of the motion to correct the scrivener's error or, in the alternative to accept the amended motion dated *nunc pro tunc* to the date of the original filing.  Therefore, the Court concludes that, under the particular facts and circumstances of this case, that Petitioner's 3.850

16

should be deemed "properly filed" on February 5, 2013. Consequently, the Court concludes that instant petition for writ of habeas corpus is timely.

## Standard of Review

A prisoner in state custody may not be granted a writ of habeas corpus for any claim that was adjudicated on the merits in state court unless the state court's decision was (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "based on an unreasonable determination of the facts in light of the evidence presented" to the State court. 28 U.S.C. § 2254(d)(1), (2); see also Williams v. Taylor, 529 U.S. 362, 405-06 (2000); Fugate v. Head, 261 F.3d 1206, 1215-16 (11th Cir. 2001). A state court decision is "contrary to" or an "unreasonable application of" the Supreme Court's clearly established precedent within the meaning of § 2254(d)(1) only if the state court applies a rule that contradicts the governing law as set forth in Supreme Court case law, or if the state court confronts a set of facts that are materially indistinguishable from those in a decision of the Supreme Court and nevertheless arrives at a result different from Supreme Court precedent. Brown v. Payton, 544 U.S. 133, 141 (2005); Williams, 529 U.S. at 405-06. A federal court must presume the correctness of the state court's factual findings, unless the petitioner overcomes them by clear and convincing evidence. See, 28 U.S.C. § 2254(e)(1); Putman v. Head, 268 F.3d 1223, 1241 (11th Cir. 2001). So long as neither the reasoning nor the result of the state court decision contradicts Supreme Court decisions, the state court's decision will not be disturbed. See Early v. Packer, 537 U.S. 3, 8 (2002). To obtain habeas relief on a claim of ineffective assistance of counsel, the petitioner must show that the state court applied Strickland an

objectively unreasonable manner." <u>Bell v. Cone</u>, 535 U.S. 685, 699 (2002).[5]

Moreover, it is well-settled that a habeas petitioner must allege facts that, if proved, would entitle him to relief. <u>See</u> <u>Blackledge v. Allison</u>, 431 U.S. 63, 75 n. 7, 97 S.Ct. 1621, 52 L.Ed.2d 136 (1977) (noting that notice pleading is not sufficient for habeas petition) (citing Advisory Committee Note to Rule 4, Rules Governing Section 2254 Cases); Rule 2, Rules Governing § 2254 Cases (requiring petitioner to state "facts supporting each ground" and "relief requested"); <u>see also</u> <u>Schriro v. Landrigan</u>, 550 U.S. 465, 474-75, 127 S.Ct. 1933, 167 L.Ed.2d 836 (2007) (holding that if the record refutes the factual allegations in the petition or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing). The pleading requirements for a petition for writ of habeas corpus under §2254 apply equally with regard to claims of ineffective assistance of counsel. Conclusory allegations of ineffective assistance of counsel are insufficient to state a claim. <u>See</u> <u>Hill v. Lockhart</u>, 474 U.S. 52, 106 S.Ct. 366, 88 L.Ed.2d 203 (1985)(conclusory allegations of ineffective assistance of counsel are insufficient to raise a constitutional issue). A petitioner's claims of ineffective assistance of counsel are thus subject to summary dismissal when they "are merely 'conclusory allegations unsupported by specifics' or 'contentions that in the face of the record are wholly incredible.'" <u>Tejada v.</u>

---

[5]To prevail on a claim of ineffective assistance of counsel, the defendant must demonstrate both (1) that his counsel's performance was deficient, and (2) that he suffered prejudice as a result of that deficient performance. <u>Strickland v. Washington</u>, 466 U.S. 668, 687-88 (1984). "To establish deficient performance, a defendant must show that his counsel's representation fell below an objective standard of reasonableness in light of prevailing professional norms at the time the representation took place." <u>Cummings v. Sec'y for Dep't of Corr.</u>, 588 F.3d 1331, 1356 (11th Cir.2009). To demonstrate prejudice, the defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." <u>Strickland</u>, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." <u>Id.</u>

Dugger, 941 F.2d 1551, 1559 (11th Cir. 1991)(citations omitted).
A habeas petitioner's claim of ineffective assistance of counsel
will thus fail unless he affirmatively demonstrates both attorney
error and resulting prejudice by alleging facts or specific details
to identify precisely how his attorney failed to fulfill his
obligations.  See Spillers v. Lockhart, 802 F.2d 1007, 1010 (8th
Cir. 1986).

## Discussion

As set forth above, Petitioner's sole claim in this proceeding
is ineffective assistance resulting in an unknowing and involuntary
guilty plea.  In support of this claim, Petitioner alleges that
both his trial attorney, the prosecutor and the state trial court
all misadvised him that, if he was found guilty on the sexual
battery charge, was would be facing a mandatory life sentence.
According to Petitioner, his "decision to forego trial was [thus]
involuntary."  (DE#1, Ground One).  In his memorandum of law in
support in his motion, Petitioner goes on to allege that, but for
his misimpression regarding the applicable penalty, that he would
not have entered the plea and would have insisted on going to
trial.  (DE#4, p.2).

Because a guilty plea is a waiver of substantial
constitutional rights, it must be a voluntary, knowing, and
intelligent act done with sufficient awareness of the relevant
circumstances and likely consequences.  Brady v. United States, 397
U.S. 742, 748 (1970).  A voluntary and intelligent plea of guilty
made by an accused person who has been advised by competent counsel
may not be collaterally attacked.  Mabry v. Johnson, 467 U.S. 504,
508 (1984).

A guilty plea is, however, open to attack on the ground that
counsel did not provide reasonably competent advice.  Cuyler v.
Sullivan, 446 U.S. 335, 344, 100 S.Ct. 1708, 1716 (1980)(citations

omitted).   A habeas petitioner can thus overcome the otherwise voluntary and intelligent character of his or her guilty plea only if he or she can establish that the advice she received from counsel was not "within the range of competence demanded of attorneys in criminal cases." McMann v. Richardson, 397 U.S. 759, 771 (1970).

Strickland's two-part test applies when a prisoner contends ineffective assistance led him or her to enter "an improvident guilty plea." Yordan v. Dugger, 909 F.2d 474,477 (11th Cir.1990) (citing Hill v. Lockhart, 474 U.S. 52 (1985)).   The first part of the Strickland test of course asks whether "counsel's assistance was reasonable considering all the circumstances."   466 U.S. at 688.   An attorney has an obligation "to consult with the defendant on important decisions and to keep the defendant informed of important developments in the course of the prosecution." Stano v. Dugger, 921 F.2d 1125, 1149-50 (11th Cir. 1991).   "Judicial scrutiny of counsel's performance must be highly deferential," however, and the courts should make certain "that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689.   Counsel's advice need not be errorless, and need not involve every conceivable defense; rather, it must simply be within the realm of competence demanded of attorneys representing criminal defendants.   Scott v. Wainwright, 698 F.2d 427, 429 (11th Cir. 1983)(citations omitted).

In cases where a guilty plea has been entered, application of Strickland's second prong requires a showing that there is a reasonable probability that, but for counsel's alleged errors, the defendant would not have pleaded guilty and would have insisted on going to trial.   Hill, 474 U.S. at 58.   However, the defendant's "mere allegation that he would have insisted on trial . . . ,

although necessary, is ultimately insufficient to entitle him [or her] to relief." U.S. v. Clingman, 288 F.3d 1183, 1186 (10th Cir. 2002); see also Hutchings v. U.S., 618 F.3d 693 (7th Cir. 2010); U.S. v. Farley,72 F.3d 158, 165 (D.C. Cir. 1995).  Rather, the defendant must generally come forward with some objective evidence that he or she would not have pled guilty.  Hutchings, 618 F.3d at 697.  Indeed, there must be some showing that the decision to proceed to trial would have been rational under the circumstances. See Padilla v. Kentucky, 559 U.S. 356, 372, 130 S.Ct. 1473, 176 L.Ed.2d 284 (2010).  As such, the court must look to the totality of the objective factual circumstances surrounding the plea in order to determine whether there is a reasonable probability that the petitioner would in fact have insisted on trial.  See, generally, Hill, 474 U.S. at 59; Hutchings, 618 F.3d at 697.  In many guilty plea cases, this inquiry will closely resemble the inquiry that the court would engage in to determine whether the result would have been different had the petitioner proceeded to trial, and will generally include assessment of matters such as the strength of the prosecution's case, any available defenses, the plea colloquy and negotiations, and the potential sentencing exposure.  See Hill 474 U.S. at 59-60; Farley, 72 F.3d at 165. These issues are relevant precisely because they provide circumstantial evidence of the defendant's state of mind in making the plea. Miller v. Champion, 262 F.3d 1066, 1073 (10th Cir. 2001); see also Singleton v. Sec'y of Dept. Of Corr., 2009 WL 975783, *4 (M.D. Fla. 2009 ("The best way to evaluate whether there is a reasonable probability a petitioner would have insisted on going to trial is to determine whether petitioner had available a defense that would likely have borne fruit at trial.").  A criminal defendant's subjective statements that he would have proceeded to trial can thus only support a finding of prejudice "if combined with probative, objective evidence" that the result would somehow

21

have been different.  Hutchings, 618 F.3d at 697.  The weight of authority holds that a self-serving and conclusory statement by the defendant is insufficient in itself to show prejudice in the context of guilty pleas.  See, e.g., United States v. Arvanitis, 902 F.2d 489, 494 (7th Cir. 1990); United States v. LaBonte, 70 F.3d 1396, 1413 (1st Cir. 1995), rev'd on other grounds, 520 U.S. 751, 117 S.Ct. 1673, 137 L.Ed.2d 1001 (1997); Parry v. Rosemeyer, 64 F.3d 110, 118 (3rd Cir. 1995); United States v. Gordon, 4 F.3d 1567, 1571 (10th Cir. 1993); United States v. Horne, 987 F.2d 833, 836 (D.C. Cir. 1993); Bonvillain v. Blackburn, 780 F.2d 1248, 1253 (5th Cir. 1986).

Here, as set forth above, the state trial court held an evidentiary hearing on Petitioner's claim that he was misadvised as to the applicable penalty at issue.  And as further set forth above, the state trial court did find that Petitioner was in fact misadvised.  This finding is, of course, entitled to substantial deference.  Maharaj v. Sec'y for Dep't of Corr., 432 F.3d 1292, 1315 (11th Cir. 2005)(citing 28 U.S.C. §2254(e)(1)(noting that "a determination of a factual issue made by a State court shall be presumed to be correct" and that an "applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence").  Indeed, neither party disputes it, and it is thus appropriate for the Court to resolve the question of whether the state court applied Strickland reasonably only on the prejudice prong of the inquiry.  See Strickland, 466 U.S. at 690 ("counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment").

With regard to whether Petitioner can show any prejudice, as also set forth above, the state trial court found that Petitioner's decision to accept the plea had nothing whatsoever to do with the misadvice regarding the potential sentencing exposure.  Rather, as

also set forth above, the trial court found that Petitioner's change of heart was due wholly to hearing the tapes of the 911 call and the call he made to his uncle from jail incriminating himself in the crimes. And again, these findings are entitled to substantial deference. *Maharaj*, 432 F.3d at 1315 (11th Cir. 2005)(*citing* 28 U.S.C. §2254(e)(1)(noting that "a determination of a factual issue made by a State court shall be presumed to be correct" and that an "applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence")). Petitioner fails to make any allegations that would rebut the presumption of correctness afforded to the state court's finding that it was hearing the tapes, and not the misadvice regarding his sentencing exposure, that caused him to accept the plea offer. As, Petitioner cannot establish that the state court's disposition of this claim did not result in the application of Strickland to the facts of this case in an objectively unreasonable manner. Therefore, Petitioner is not entitled to relief on this claim. *See Bell*, 535 U.S. at 699 (to obtain habeas relief, Petitioner must show state court applied Strickland in an objectively unreasonable manner); *see also* 28 U.S.C. §2254(e)(1)("a determination of a factual issue made by a State court shall be presumed to be correct" and that an "applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence").[6]

---

[6]It bears noting that, even if the Court had occasion to review the prejudice prong of Petitioner's ineffectiveness claim *de novo*, Petitioner's claim would nevertheless fail. Specifically, Petitioner offers nothing but his own, after-the-fact, self-serving conclusory statement that, but for the misadvice regarding his sentencing exposure, he would have proceeded to trial. However, as set forth in the discussion regarding the standard applicable to claims of misadvice on a plea, this is generally insufficient to establish prejudice. *See Hutchings*, 618 F.3d at 697 (defendant must generally come forward with some objective evidence that he or she would not have pled guilty); *Clingman*, 288 F.3d at 1186 (mere allegations that defendant would have proceeded to trial insufficient). Moreover, the state had Petitioner dead to rights with the 911 tape of the assault as it occurred in real time and the tape of Petitioner's incriminating phone call with his uncle, Petitioner apparently had no viable defense, and Petitioner entered a negotiated plea in exchange for a downward departure sentence of seventeen years in prison, when his scoresheet showed that

<u>Certificate of Appealability</u>

Rule 11(a) of the Rules Governing Section 2254 Cases provides that "the district court must issue or deny a certificate of appealability when it enters a final order adverse to the 2applicant," and that if a certificate is issued, "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. §2253(c)(2)." Rule 11(a), Rules Governing Section 2254 Cases in the United States District Courts. Rule 11(a) further provides that "[b]efore entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue." <u>Id.</u> Regardless, a timely notice of appeal must still be filed, even if the court issues a certificate of appealability. Rule 11(b), Habeas Rules.

A certificate of appealability may issue only upon a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Where a habeas petitioner's constitutional claims have been adjudicated and denied on the merits by the district court, the petitioner must demonstrate reasonable jurists could debate whether the issue should have been decided differently or show the issue is adequate to deserve encouragement to proceed further. <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 336-38 (2003); <u>Slack v. McDaniel</u>, 529 U.S. 473, 483-84 (2000). Where a petitioner's constitutional claims are dismissed on procedural grounds, a certificate of appealability will not issue unless the petitioner can demonstrate both "(1) 'that jurists of reason would find it debatable whether the petition [or motion] states a valid claim of

---

Petitioner otherwise scored a lowest permissible prison sentence of more than 29 years in prison. As such, the totality of the circumstances belie any claim that Petitioner would have proceeded to trial. <u>See</u> <u>Padilla</u>, 559 U.S. at 372 (requiring some showing that decision to proceed to trial would have been rational under the circumstances); <u>Singleton</u>, 2009 WL 975783 at *4 ("The best way to evaluate whether there is a reasonable probability a petitioner would have insisted on going to trial is to determine whether petitioner had available a defense that would likely have borne fruit at trial.").

denial of a constitutional right' and (2) 'that jurists of reason would find it debatable whether the district court was correct in its procedural ruling.'" Rose v. Lee, 252 F.3d 676, 684 (4th Cir.2001)(quoting Slack, 529 U.S. at 484). "Each component of the §2253(c) showing is part of a threshold inquiry, and a court may find that it can dispose of the application in a fair and prompt manner if it proceeds first to resolve the issue whose answer is more apparent from the record and arguments." Slack, 529 U.S. at 484-85.

Having determined that Petitioner is not entitled to relief on the merits, the court considers whether Petitioner is nonetheless entitled to a certificate of appealability with respect to one or more of the issues presented in the instant petition. After reviewing the claims presented in light of the applicable standard, the court finds reasonable jurists would not find the court's treatment of any of petitioner's claims debatable or wrong and none of the issue are adequate to deserve encouragement to proceed further. Accordingly, a certificate of appealability is not warranted. See Miller-El, 537 U.S. at 336-38; Slack, 529 U.S. at 483-84.

Conclusion

Based upon the foregoing, it is recommended that this petition for writ of habeas corpus be DENIED, and that no certificate of appealbility be issued.

Objections to this report may be filed with the District Judge within fourteen days of receipt of a copy of the report, including any objections to the recommendation that no certificate of appealability be issued.

SIGNED this 13th day of July, 2017.

UNITED STATES MAGISTRATE JUDGE

Mark Ondich
B08089
Central Florida Reception Center
Inmate Mail/Parcels
7000 H.C. Kelley Road
Orlando, FL 32831

Jeanine Marie Germanowicz
Attorney General Office
1515 N Flagler Drive
Suite 900
West Palm Beach, FL 33401-3432